UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 3:25-82 |
| JOSE GONZALEZ-NIEVES, | : | (JUDGE MANNION) |
| Defendant | : | |

## MEMORANDUM

Pending before the court is defendant Jose Gonzalez-Nieves' motion to suppress evidence. (**Doc. 27**). The defendant is charged with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846, and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §841. (Doc. 1). The drug evidence was seized pursuant to a February 7, 2024, traffic stop for a suspected window tint violation. The defendant seeks the court to suppress the drug evidence seized during the traffic stop, as well as all derivative evidence seized thereafter. The defendant contends that the evidence was unlawfully obtained as the police officers impermissibly prolonged the traffic stop and did not obtain proper consent from the defendant to search the vehicle.

For the reasons discussed below, after consideration of the briefs and evidence submitted, including bodycam video recordings of the traffic stop, and after a January 23, 2025, evidentiary hearing, the motion to suppress the evidence will be **DENIED**.

## I.    BACKGROUND[1]

On February 7, 2024, at approximately 7:50 p.m., Sergeant Jason Gula of the Scranton Police Department was conducting surveillance in a high crime area of the 300 block of Meadow Avenue in Scranton when he, in his own words:

> observed a Black Dodge passenger car parked in front of the stairs area of the Wells Fargo Bank. The vehicle was running with the lights on while parked in front of the bank. At approximat[el]y 19:50 hours, Sgt. Gula observed a Honda automobile, blue in color bearing PA Registration LHT5394, arrived at the Wells Fargo Bank and park in a parking spot. Upon arrival of this vehicle, an unknown male exited the Dodge vehicle and an unknown male exited the Honda. Both males then walked up to the ATM where they appeared to be engaged in a conversation. Shortly after, the unknown male driver of the Dodge left the ATM area and entered into his

---

[1] The court notes that, for present purposes, it bases the factual background of this case on the briefs of the parties and the accompanying exhibits, including the bodycam recordings of the February 7, 2024, traffic stop, the Scranton Police Department field report of the incident, written by Sergeant Jason Gula, and Spanish-to-English translations provided by the parties.

The court also notes that all the times stated herein are approximations based on the bodycam video recordings.

vehicle. The vehicle then began to drive towards the Meadow Avenue exit of the parking lot. Sgt. Gula observed the vehicle then cross Meadow Avenue and park at a gas pump at the gas station located at Meadow Avenue and River Street, across from the Wells Fargo bank. Sgt. Gula then observed the additional unknown male enter back inside the Honda vehicle, exit the parking lot and proceed north on Meadow Avenue to the Gerrity[']s parking lot. Sgt. Gula then repositioned his patrol vehicle to the Gerrity's parking lot in the 300 Meadow Avenue.

(Doc. 31-2 at 4). At approximately 8:14 p.m., about 24 minutes after his initial observation of the vehicle, Sgt. Gula observed the Dodge, driven by the defendant, exit the gas station. *Id.* Sgt. Gula noticed that the vehicle had "heavily tinted windows," and conducted a traffic stop. *Id.*

After Sgt. Gula approached the passenger-side window and asked for the defendant's license and registration, the defendant advised Sgt. Gula that he did not have a license, and that the vehicle belonged to his son who lived in Texas. The vehicle was, in fact registered in Texas, but to a woman named Nicole Rodriguez, who he subsequently claimed was his son's mother. Upon further questioning, he claimed his son's name was "Stephanie." He also claimed that he lived in the "Hilltop" section of Scranton, despite his ID card identifying Pittston Avenue as his home. Pittston Avenue is not in the "Hilltop" section of Scranton.

Sgt. Gula then instructed the defendant to exit the vehicle and issued him a written warning for a window tint violation. During this time, the defendant clarified that his wife lives in Hilltop. Because of the defendant's alleged difficulties understanding English, Sgt. Gula allowed him to call his wife, who acted as a translator over the phone. During this time, Patrolman Griffith who arrived on the scene and notified Sgt. Gula that "he observed in plain view inside the driver's side door of the vehicle, a large amount of U.S. Currency." *Id.*

Following the issuance of the written warning, which was explained and translated to the defendant, then signed by the defendant, Sgt. Gula asked the defendant "where are you coming from now?" In response, the defendant, through two remote translators whom the court understands were his wife and daughter, answered that he was depositing rent at the bank. Sgt. Gula then asked whom the defendant met at the bank, and the defendant answered that he was meeting a coworker. Sgt. Gula inquired where the defendant works, and after over a minute of back and forth in Spanish with his family members, the defendant finally stated that he works at a cable factory in Jessup, Pennsylvania.

When asked about the coworker that the defendant met at the bank, he responded that he does not know the coworker's name. After obtaining the defendant's consent, a safety search of his person was conducted. Sgt. Gula then followed up, asking why they met at the bank. Before the defendant could answer, one of his translators responded "no, it was just like a coincidence."

When asked if there were any drugs or money in the car. The defendant indicated that there were no drugs, but that there was $600 in cash. One of the defendant's translators then added that the money was for rent for a barbershop that the defendant owns and runs.

Sgt. Gula inquired if he could search the vehicle for drugs or weapons, to which the defendant asked whether "an order" is needed for a search. In response Sgt. Gula said:

> If you would not like to give consent, then what happens is I can make application for a search warrant of his vehicle, upon doing that, his vehicle will be towed [and] impounded and if the application is approved, the search warrant is executed in 48 hours.

In response, one of the defendant's translators asked why a search was necessary. Sgt. Gula responded:

> Because I have reasonable suspicion right now that there is criminal activity, so as I explained, he can give consent to

search the vehicle or I can make application for a search warrant and we impound the vehicle . . . [translator asks whether the officer can impound the vehicle] . . . yes, if I make application for the search warrant, the vehicle gets towed.

When the defendant and his translators asked for a reexplanation, Sgt. Gula responded:

He has two options if you want to explain it, okay, and I want to make sure it's extremely clear to him because we're using a translator here, okay? So, he can give consent to search the vehicle. He can give us permission to search the vehicle basically. If he wishes to not give consent to search the vehicle, how about explaining that first? . . . [translator translates] . . . Okay, if he wishes to not give consent, I can make application for a search warrant for the vehicle, the vehicle will be towed and impounded. If the search warrant is approved, it'll be executed within 48 hours.

After translating Sgt. Gula's statement, one of the defendant's translators asked Sgt. Gula if he could "explain to [the defendant] better because we're not understanding a lot right now." Ptlm Griffith, stepped in, stating:

If we do not receive permission to search the vehicle, we will potentially be applying for a search warrant . . . [translator translates] . . . When we make application for the search warrant, the vehicle will be secured while we apply for the search warrant. We have 48 hours to do that . . . [translator translates] . . . If we then receive an approved search warrant from a judge, we have 48 hours to execute the search warrant and search the vehicle if the warrant is granted . . . [translator translates] . . . With that in mind and knowing all of your available options at this point, is it okay for us to search your vehicle?

- 6 -

The defendant then responded, and one of his translators relayed, "yeah, he said you can." Wanting to confirm that everyone understood, Sgt. Gula said, "I want to be sure this is clear, okay? Can you ask him again in these exact words, 'do we have permission to search his vehicle?'" After one of the defendant's translators translated, she said, "he said yes." Sgt. Gula then directly asked the defendant, "we can search your car, yes?" The defendant responded, "yeah."

Sgt. Gula ultimately seized: a "[p]ink bag, miscellaneous papers, $600.00 USC, ATM receipt, (2) clear plastic baggies of suspected cocaine, [and] an opened vacu[um] sealed bag." (Doc. 31-2 at 6). Testing confirmed that the suspected substance was, in fact, cocaine. *Id.*

The next day, on February 8, 2024, a state search warrant was issued for the defendant's cellphone. On March 29, 2024, a state search warrant was issued for the barbershop at 618 Cedar Avenue, Scranton, PA. (Doc. 28, Ex. D). The search resulted in the seizure of a green holster, blue notebook, assorted clear plastic bags, a clear vacuum sealed bag with residue, an orange pill bottle with tablets, and a food saver vacuum sealer. *Id.* Finally, on April 3, 2024, a state search warrant was issued for 422 Emmett Street, Apartment 1, Scranton, PA. (Doc. 28, Ex. E). Officers seized

an orange notebook, a manila envelope with emails, an "Ortiz Joyeria" receipt, a gray tote bag with mail and financial documents, a purple folder with assorted documents, a rose gold Apple computer, a silver iPhone, another silver iPhone in a cracked clear case, and a white iPhone in a red case. *Id.*

On March 18, 2025, a two-count federal indictment was issued, charging the defendant with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846, and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §841. (Doc. 1). The defendant has pleaded not guilty to the charges. (Doc. 13).

On September 29, 2025, the defendant filed the instant motion to suppress all evidence seized during the traffic stop and after, as well as an accompanying brief in support, arguing that the scope of the traffic stop infringed on the defendant's Fourth Amendment rights. (Docs. 26-27). On November 17, 2025, the Government filed its brief in opposition. (Doc. 31). On December 1, 2025, the defendant filed his reply brief. (Doc. 32). On January 23, 2026, the court held an evidentiary hearing on the matter. Finally, on March 3, 2026, the Government filed Spanish-to-English

translations of the Spanish spoken between the defendant and his translators, as requested by the court. (Docs. 41-42). The defendant concurred with these translations. The matter is now ripe for disposition.

## II.    LEGAL STANDARD

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. *Lange v. California*, 594 U.S. 295 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." *Adams v. Springmeyer*, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 753-55, (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and

security of individuals against arbitrary invasions" by the government. *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296 (2018) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an

- 10 -

unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." *United States v. Ellis*, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). "Under *Katz*, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." *Id.* (citations omitted).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Lara-Mejia*, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" *Id.* "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *Id.* (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.

- 11 -

1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation omitted). Stated otherwise, where the search or seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." *United States v. Lowe*, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011).

## III.  DISCUSSION

The defendant raises two arguments in support of his motion to suppress. First, that "the officers unreasonably prolonged the traffic stop by starting an investigation of ordinary criminal wrongdoing in the absence of reasonable suspicion." (Doc. 27 at 14) (emphasis and capitalization omitted). Second, that "[the defendant's] consent to search the vehicle was involuntary and invalid, and the officers' threat to impound the automobile itself amounted to a constructive dispossession of property of impermissible

- 12 -

length under *Terry*." *Id.* at 17 (emphasis and capitalization omitted). The court will address each of these arguments below.

### A. Was the traffic stop unreasonably prolonged?

The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). Furthermore, "[a]t the moment when an off-mission inquiry measurably prolongs a stop—sometimes called the '*Rodriguez* moment'—the officers must have developed reasonable suspicion of criminal activity independent of the traffic violation itself. Otherwise, the extension of the stop violates the Fourth Amendment." *United States v. Ross*, 2025 WL 2396859, *4 (3d Cir. 2025). Reasonable suspicion means that "the likelihood of criminal activity need not rise to the level of probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). To determine whether a reasonable suspicion existed to justify a prolonged stop, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "This process allows officers to

- 13 -

draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, at 273 (citing *Cortez* at 418).

Here, the defendant argues that the *Rodriguez* moment "occurred just after [Sgt.] Gula issued a written warning to [the defendant], at the latest." (Doc. 27 at 15-16). The Government does not offer an alternative moment. The defendant argues that at this point, right before he began asking the defendant questions about where he had been, what he had been doing, and who he had been with, Sgt. Gula had not developed a reasonable suspicion of any criminal activity. *Id.* at 16. The court disagrees.

Assuming arguendo that issuance of the written warning was the "*Rodriguez* moment," by the time Sgt. Gula pulled the defendant over for a suspected window tint violation, he had already observed the defendant waiting in the parking lot of the Wells Fargo bank for several minutes, until a Honda arrived. The defendant then exited the vehicle and interacted with the individual who had been driving the Honda. Afterward, the defendant exited the Wells Fargo parking lot and proceeded to a gas station parking lot nearby. After approximately 24 minutes, he exited the parking lot and was pulled over for the window tint violation. While Sgt. Gula did not observe any

- 14 -

overt criminal exchange during this timeframe, the course of events were "reasonably suspicious," given that Sgt. Gula "[was] aware through his experience, this area [in and around the 300 block of Meadow Avenue] is known as a high drug activity area. [He was] aware and has participated in multiple drug arrests in this area over the past several years," and that the interaction between the defendant and the unidentified individual appeared to be a planned meetup. (Doc. 31-2 at 4).

Importantly, when Sgt. Gula stopped the defendant and asked for his license and registration, the defendant indicated that he does not have a valid drivers' license and that the Dodge was registered to his son who lives in Texas. Upon review of the registration, Sgt. Gula discovered that the car was registered to a "Nicole Rodriguez" and not his son. The defendant also indicated that he lived in the "Hilltop" section of Scranton, despite his non-license ID card indicating that he lives on Pittston Avenue in South Scranton, i.e., not "Hilltop." Finally, when Ptlm. Griffith arrived on the scene he noted that he observed a large stack of cash (later determined to be $600) in plain view in the driver's side door pocket.

The pre-stop observations combined with the inconsistent responses to Sgt. Gula's questions, border-state license plates, and the large sum of

- 15 -

cash in plain view together suffice to establish reasonable suspicion of criminal activity. Further, the Supreme Court has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette v. California*, 572 U.S. 393, 403 (2014) (quoting *Arvizu*, 534 U.S. at 277)); *see also United States v. Williams*, 3 F.3d 69, 73 (3d Cir. 1993) (finding that a magistrate judge's finding of probable cause—a higher burden than reasonable suspicion—for a search warrant was permitted even where "innocuous explanations could exist for each of the[ ] phenomena [that he relied on] in isolation"). Simply put, the totality of the circumstances established reasonable suspicion, even if each inference drawn by Sgt. Gula could be refuted with an innocent explanation. The inquiry is not whether Sgt. Gula's suspicions were correct, but whether they were reasonable.

The court notes that the defendant argues that "Sgt. Gula's Field Case Report also indicates he came to believe [the defendant] 'may have been and was currently involved in criminal activity' only after he had asked [the defendant] several questions post-issuance of the warning." (Doc. 32 at 2-3) (citing Doc. 31-2 at 5). However, the defendant omits that Sgt. Gula prefaced that statement with "[b]ased upon the previous facts," which seems to indicate that his reasonable suspicion was informed by the pre-issuance

- 16 -

observations and questions, not just post-issuance questioning. Furthermore, the court notes that Sgt. Gula could have "reasonably suspected" criminal activity without having "believed" there was criminal activity prior to the post-issuance questioning. Thus, Sgt. Gula's post-issuance of a written warning for a window tint violation questioning of the defendant was not an improper elongation of the traffic stop warranting suppression.

Finally, the defendant argues that at one point during the traffic stop Sgt. Gula was on the phone with who he says was Corporal Joe Holland of the Pennsylvania State Police. (Doc. 37 at 34). Sgt. Gula said "This guy [the defendant] is, he's up to something. I don't know what it is . . . I don't know what he's up to . . . It's probably gonna be nothing. I'm sure." (Doc. 41 at 17). During the evidentiary hearing, counsel for the defendant asked Sgt. Gula, "So here you said [']it's probably going to be nothing I'm sure.['] Why did you say that?" (Doc. 37 at 34). Sgt. Gula responded: "[s]o generally, you know, through my investigations, traffic stops, anything like that, I have reasonable suspicion something may be occurring, but I will give the person the benefit of the doubt. Even though I have suspicions at this point, it's -- I am just suspicious something did occur." *Id.* The court finds that Sgt. Gula's musings

- 17 -

about possible outcomes is insufficient to overcome the observations that support the argument that Sgt. Gula held a reasonable suspicion.

### B. Was the defendant's consent involuntary and invalid?

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Furthermore, "*Bumper* does not establish a blanket rule that, whenever police possess an invalid search warrant or falsely claim that they can obtain one, voluntariness is necessarily vitiated." *United States v. Sebetich*, 776 F.2d 412, 424 (3d Cir. 1985) (citing *United States v. Molt*, 589 F.2d 1247, 1251-52 (2d Cir. 1978)). Indeed, the Third Circuit has stated that where a law enforcement officer truthfully indicates that he will "seek to obtain a warrant," he is not engaging in "deceit or trickery," but rather providing "a fair and sensible appraisal of the realities." *Id.* at 424-25. Further, "Where an officer's 'representation would not constitute deceit or trickery, but only a "fair and sensible appraisal" of the

- 18 -

realities facing the defendant,' such as *accurately* stating that a warrant will inevitably issue in the absence of consent or stating that an officer will *seek* a warrant without implying that it will issue, then that representation has little bearing to the voluntariness inquiry." *Horton v. Mills*, 2025 WL 1151673, at *18 (M.D.Pa. 2025) (emphasis in original). Finally, "police officers at times engage in a 'sales job' to make the alternative of consenting to a search more attractive than the option of forcing the officers to obtain a search warrant, and such attempts to persuade a party 'by pointing out the potential inconvenience and distasteful impacts which the execution of a search warrant may have' are permissible and do not render consent involuntary." *Id.* (quoting *United States v. Claus*, 2010 WL 3522117, at *4 (W.D.Pa. 2010)).

Here, the defendant argues that Sgt. Gula and Ptlm. Griffith "caused the translator[s] and [the defendant] to believe his consent was immaterial—the officers would obtain a warrant and search the Charger regardless—rendering his consent involuntary considering the totality of the circumstances." (Doc. 27 at 21). The court disagrees.

Examining the interactions between the officers and the defendant, voluntary consent was obtained. Sgt. Gula initiated by asking if he could

search the vehicle. The defendant responded, asking whether "an order" is needed for a search. Sgt. Gula clarified that the defendant could either give consent, or he would tow and impound the vehicle and apply for a search warrant, which, if approved, would be executed in 48 hours. In response, one of the defendant's translators, asked why a search was necessary. Sgt. Gula notified her that he had "reasonable suspicion" of criminal activity and again reiterated the defendant's options.

The defendant argues that Sgt. Gula's statement that he had "reasonable suspicion" was deceitful, as probable cause is the necessary standard to obtain a warrant and "[a] reasonable person assumes an officer knows the quantum and quality of proof necessary to obtain a warrant and will apply for a warrant only when he believes he can obtain one." (Doc. 27 at 19). However, the officers never guaranteed that they would be able to obtain a search warrant, they only indicated that they would apply for one. This is the exact pointing out of potential inconveniences of not consenting to a search that courts have established officers are permitted to make. Furthermore, the defendant argues that Sgt. Gula's indication that application for a search warrant would result in the vehicle getting towed constituted constructive dispossession. However, the defendant fails to

acknowledge that the officers had the authority to tow the vehicle absent the defendant's consent to a search anyway, as driving without a drivers' license is grounds for impoundment. *See* 75 Pa.C.S. §6309.2(a)(1) (permitting law enforcement officers to immobilize, tow, and store vehicles operated by persons without a valid license).

Moving forward, Sgt. Gula again explained the defendant's options, before Ptlm Griffith stepped in and also broke down the options for the defendant, who then consented to the officers' search of the vehicle. Out of an abundance of caution, Sgt. Gula asked for, and was given, consent twice more before conducting the search.

Throughout these interactions, the officers truthfully explained the situation, indicating that the defendant could consent to the search or they would seek a warrant. In other words, the officers offered a "fair and sensible appraisal." Furthermore, the officers went out of their way to ensure that the defendant's consent was voluntary and informed, asking for the defendant to confirm his consent more than once. Finally, the court has reviewed the Spanish-to-English translations of the defendant's interactions with his translators, (Docs. 41-42), and finds that the officer's statements and their implications were adequately and clearly communicated to the defendant. It

is also noteworthy that the defendant clearly had the ability to communicate, to a reasonable extent, in English, as shown on the bodycam video recordings of the incident. Thus, the court finds that the defendant's consent to the search was voluntary and therefore valid.

## IV. CONCLUSION

For the aforesaid reasons, the defendant's motion to suppress evidence will be **DENIED**. The evidence seized during the February 7, 2024, traffic stop is admissible, as is the evidence seized pursuant to warrants relying on the evidence obtained during the February 7, 2024, stop. An appropriate order follows.

**MALACHY E. MANNION**
**United States District Judge**

**DATE:** 3/13/26

25-82-01

- 22 -